## UNDERHILL v. HERNANDEZ.

(Circuit Court of Appeals, Second Circuit. January 23, 1895.)

### No. 62.

**1. INTERNATIONAL LAW—IMMUNITY OF OFFICERS OF FOREIGN GOVERNMENTS.**
Public agents, military or civil, of foreign governments, whether such governments be de jure or de facto, cannot be held responsible, in any court within the United States, for acts done within their own states, in the exercise of the sovereignty thereof, or pursuant to the directions of their governments; and this immunity extends to the agents of a revolutionary government, set up by a part of the citizens of a foreign country, which is ultimately established and recognized by the government of the United States.

**2. SAME.**

> A military commander acting under the authority of a revolutionary government in Venezuela, which was afterwards recognized by the United States as the legitimate government of that country, is not liable, in an action in a court of the United States, for imprisonment of, and assault and battery committed upon, a citizen of the United States.

In Error to the Circuit Court of the United States for the Eastern District of New York.

This was an action by George F. Underhill against Jose Manuel Hernandez for false imprisonment and assault and battery. The jury in the circuit court returned a verdict for the defendant, by direction of the court. Plaintiff brings error.

Logan, Clarke & Demond, for plaintiff in error.

F. R. Coudert and Joseph Kling, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is a writ of error by the plaintiff in the court below to review a judgment for the defendant entered upon the verdict of a jury pursuant to the direction of the trial judge. The suit was for false imprisonment and assault and battery of the plaintiff, committed by the defendant at the city of Bolivar, Venezuela. The acts complained of consisted in the detention of the plaintiff at his own residence, in the city of Bolivar, under a guard of soldiers stationed near the house, from August 13 to October 18, 1892, by the authority of the defendant, during which time the plaintiff was not permitted to leave the house without an escort of soldiers, and was several times refused a passport to leave the city, for which he made application to the defendant. During this period the defendant was in command of the city, as a military officer. A revolution had been organized against the government of Venezuela, and an army had been mustered against the adherents of the recent president, whose term of office had expired, and who, it was claimed by the revolutionists, no longer represented the legitimate government. The principal parties to this conflict were those who recognized Palacio as their chief, and those who followed the leadership of Crespo. The defendant belonged to the revolutionary party, and commanded its forces in the vicinity of Bolivar. Early in August, an engagement took place between the forces of the two parties, near Bolivar. The revolutionists prevailed, and August 13th the defendant entered Bolivar, at the head of his forces, and assumed command of the city. From that time until the plaintiff was permitted to leave Bolivar, the defendant was the civil and military chief. Early in October, the revolutionary party prevailed generally, and took possession of the capital of Venezuela; and on the 26th day of October, 1892, the "Crespo Government," so called, was formally recognized as the legitimate government of Venezuela by the government of the United States, pursuant to instructions from the state department, to our minister, to recognize the new government, provided it was "accepted by the people, in the possession of the power of the nation, and fully established." The plaintiff was a citizen of the United States, who had constructed a water-works

system for the city of Bolivar under a contract with the government, and was engaged in supplying the place with water. He also carried on a machinery repair business. The evidence upon the trial indicated that the purpose of the defendant, in his treatment of the plaintiff, was to coerce the plaintiff to operate his water works and his repair works for the benefit of the community and the revolutionary forces. It was not sufficient to have warranted a finding by the jury that the defendant was actuated by malice, or any personal or private motive. The trial judge ruled, at the request of the defendant, that upon these facts the plaintiff was not entitled to recover, and directed a verdict for the defendant, against the exceptions of the plaintiff. The important question presented by the assignments of error arises upon the exception to the direction of a verdict for the defendant. This ruling proceeded upon the ground that because the acts of the defendant were those of a military commander, representing a de facto government in the prosecution of a war, he was not civilly responsible therefor.

Considerations of comity, and of the highest expediency, require that the conduct of states, whether in transactions with other states or with individuals, their own citizens or foreign citizens, should not be called in question by the legal tribunals of another jurisdiction. The citizens of a state have an adequate redress for any grievances at its hands by an appeal to the courts or the other departments of their own government. Foreign citizens can rely upon the intervention of their respective governments to redress their wrongs, even by a resort, if necessary, to the arbitrament of war. It would be not only offensive and unnecessary, but it would imperil the amicable relations between governments, and vex the peace of nations, to permit the sovereign acts or political transactions of states to be subjected to the examination of the legal tribunals of other states. Influenced by these reasons, and because the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers, courts and publicists have recognized the immunity of public agents from suits brought in foreign tribunals for acts done within their own states in the exercise of the sovereignty thereof. In Moodalay v. Morton, 1 Brown, Ch. 469, the master of the rolls, while retaining jurisdiction of a suit which involved the private transactions of the East India Company, said:

"They have rights as a sovereign power. They have also duties as individuals. If they enter into bonds in India, the sums secured may be recovered here. I admit that no suit will lie in this court, against a sovereign power, for anything done in that capacity."

In Nabob of Arcot v. East India Co., 4 Brown, Ch. 180, the answer to a bill in equity alleged that all the transactions mentioned in the bill were of a political nature, and matters of state, and the court dismissed the suit upon that ground. In Duke of Brunswick v. King of Hanover, 6 Beav. 1, the master of the rolls concluded an elaborate discussion of the liability of the defendant to a suit in chancery with the opinion that the king of Hanover, although a subject of Great Britain, was exempt from all liability to be sued in the courts of

that country for any acts done by him as king of Hanover. Upon an appeal from his judgment dismissing the cause, to the house of lords (2 H. L. Cas. 1), that tribunal decided that the defendant, notwithstanding he was a British subject, and was in England, exercising his rights as such, when sued, could not be made to account in the court of chancery for acts of state, whether right or wrong, done by him abroad, in virtue of his authority as sovereign. The decision was put, not upon the personal immunity of the sovereign from suit, but upon the principle that no court in England could sit in judgment upon the act of a sovereign, effected by virtue of his sovereign authority abroad. The lord chancellor said that "a foreign sovereign, coming into this country, cannot be made responsible here for an act done in his sovereign character in his own country"; that "the courts of this country cannot sit in judgment upon the act of a sovereign, effected by virtue of his sovereign authority abroad,—an act not done as a British subject, but supposed to be done in the exercise of his authority vested in him as sovereign. * * *" In Hatch v. Baez, 7 Hun, 596, the New York supreme court decided that an action could not be maintained in the courts of the state against the former president of the Dominican republic, for acts done by him in his official capacity, although he had ceased to be president when the suit was brought. The court said:

"We think that by the universal comity of nations, and the established rules of international law, the courts of one country are bound to abstain from sitting in judgment on the acts of another government, done within its own territory. * * * To make him amenable to a foreign jurisdiction for such acts would be a direct assault upon the sovereignty and independence of his country. * * * The fact that the defendant has ceased to be president of St. Domingo does not destroy his immunity. That springs from the capacity in which the acts were done, and protects the individual who did them, because they emanated from a foreign and friendly government."

The law officers of the United States have uniformly advised the executive department that individuals are not answerable in foreign tribunals for acts done in their own country, in behalf of their government, by virtue of their official authority.

In 1794, one Collet, lately the French governor of Guadaloupe, was arrested in this country, in an action brought against him for the seizure and condemnation of a vessel. The matter having been brought to the attention of our government, it was referred to the attorney general; and he advised that, the defendant being subject to process, the government could not then intervene, but added his opinion that if the seizure of the vessel were admitted to have been an official act, done by the defendant by virtue or under color of the powers vested in him as governor, it would of itself be a sufficient answer to the plaintiff's action, and that the defendant ought not to answer in our courts for any mere irregularity in the exercise of his powers, and that the extent of his authority could, with propriety or convenience, be determined only by the constituted authorities of his own nation. 1 Op. Attys. Gen. 45, 46. In 1797, in the Case of Sinclair, the attorney general expressed the opinion "that a person acting under a commission from the sovereign of a foreign state is not amenable for what he does, in pursuance of his commission,

to any tribunal of the United States." Id. 81. In 1871, the attorney general advised the secretary of state as follows:

"It has often been laid down that, before a citizen of one country is entitled to the aid of his government in obtaining redress for wrongs done him by another government, he must have sought redress in vain from the tribunals of the offending power. The object of this rule, plainly, is to give the offending government an opportunity of doing justice to the injured party in its own regular way, and thus avoid all occasion for international discussion." 13 Op. Attys. Gen. 550.

In 1872, in the case of The Tipitapa, the attorney general advised the secretary of state, in a case where an officer, with a party of armed men, acting under an order of the judicial officer of the port of Granada, seized an American vessel at that port,—the seizure having been made for the purpose of enforcing a supposed legal right,—"that the government ought not to make reclamation in behalf of the owner, as it is presumable that if the proceedings were illegal the judicial tribunals of Nicaragua would afford redress." Id. 554.

Conspicuous among the acts which are sheltered by this principle of international law are those of military officers in command of the armed forces of the state. According to one of the most recent commentators upon international law (Hall, § 102), officers in command of armed forces of the state, and their subordinates and soldiers, are not in any case amenable to the civil or criminal laws of a foreign state, in respect to acts done in their capacity as agents, for which they would be punishable or civilly responsible if done in their private capacity. This doctrine was sanctioned by our own government, in 1841, in the Case of McLeod, who was under indictment for murder in a state court of New York. He had been engaged, as a member of the colonial forces, in repelling an attack made upon Canada by an armed force from the United States, and had assisted in the destruction of a vessel moored on the American shore of the Niagara river, during which an American citizen was killed. The British government, through its minister at Washington, demanded his release upon the ground that the destruction of the vessel was a public act of persons in her majesty's service, obeying orders of the superior authorities, and therefore, according to the usages of nations, could only be the subject of discussion between the two governments. Mr. Webster, then secretary of state, acceded to this view, stating that:

"The government of the United States entertains no doubt that, after the avowal of the transaction as a public transaction authorized by the British authorities, the individuals concerned in it ought not, by the principles of public law, and the general usage of civilized states, to be holden personally responsible, in the ordinary tribunals of law, for their participation in it."

The courts of New York refused to release McLeod, at the intervention of the general government, and he was tried, but acquitted on proof of an alibi. The episode led to the enactment by congress, in 1842, of the provision (now section 753, Rev. St.) by which the courts of the United States are authorized to issue a writ of habeas corpus "where a person, being a subject or citizen of a foreign state, and domiciled therein, is in custody for an act done or omitted under

any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, or order, or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations."

Upon principle, it cannot be important whether the acts of military authorities, when called in question, are done by the authority of a de jure or titular, or of a de facto, government. In either case, if they are done in the legitimate exercise of belligerent powers, they are not ordinarily attended with civil responsibility. This principle has been recognized by the supreme court of the United States in cases in which the civil liability of Confederate soldiers for acts done, as members of the insurgent forces, during the Rebellion, was under consideration. Ford v. Surget, 97 U. S. 594; Freeland v. Williams, 131 U. S. 405, 9 Sup. Ct. 763. As was decided in Williams v. Bruffy, 96 U. S. 176, the government of the Confederate States was a de facto government of an inferior class. "It never represented a nation. It never expelled the public authorities from the country. It never entered into any treaties, nor was it ever recognized as a government by an independent power." Ford v. Surget was an action brought by the plaintiff to recover the value of certain cotton destroyed during the war of the Rebellion in the state of Mississippi; and the court held that the defense that it was destroyed by the defendant, acting under the orders of the military authorities of the Confederate States, was a good justification. Freeland v. Williams was a bill in equity to invalidate a judgment of the court of the state of West Virginia, obtained against the defendant for a tort committed by him as a soldier of the Confederate army. One of the questions discussed was whether the judgment was void, inasmuch as it proceeded upon the ground that the defendant was civilly responsible, as a trespasser, for an act done by him, as a Confederate soldier, in accordance with the usages of civilized war. In the prevailing opinion, the court said:

"The case, as presented to us, shows that the trespass for which the original judgment was rendered was of that character; and it is argued with much force that the court which rendered that judgment had no jurisdiction in the case, or, at all events, had no jurisdiction to render such a judgment, and that it is therefore void. It follows from this view of the subject that the court in which it was originally rendered had jurisdiction to set aside or annul it, without the aid of the constitutional provision of the state of Virginia, and that on that ground alone the decree we are called upon to review must be affirmed. In this view of the subject, some of the judges of this court concur."

Again, the court say:

"If it be true that, when the original action was presented to the circuit court of Preston county, the thing complained of was found to be an act in accordance with the usages of civilized war, during the existence of a war flagrant in that part of the country, that court should have proceeded no further, and its subsequent proceedings may be held to have been without authority of law. While it is not necessary to hold that the judgment, as presented by the record, is absolutely void, it may be conceded that a court of equity, in a proper case, can prevent the enforcement of it."

In a dissenting opinion, Mr. Justice Harlan insisted that the judgment was not void, but conceded that the complainant was not

civilly responsible, if his act was one of legitimate warfare, as a soldier in the Confederate army.

The acts of the defendant, as a military commander of the revolutionary forces in the civil war in Venezuela, although performed before the revolution became successful, are sheltered by the same immunities that would surround them if they had been performed subsequently. The organization, of which he was a part, represented that kind of a de facto government which is described in Williams v. Bruffy:

"Such as exists where a portion of the inhabitants of a country have separated themselves from the parent state, and established an independent government. The validity of its acts, both against the parent state, and its citizens or subjects, depends entirely upon its ultimate success. If it fail to establish itself permanently, all such acts perish with it. If it succeed, and become recognized, its acts, from the commencement of its existence, are upheld, as those of an independent nation."

By its success, the revolutionary party vindicated its claim to recognition as the legitimate government of Venezuela, and achieved a justification, in the estimation of foreign governments and their legal tribunals, for the acts of its military forces, as complete and ample as though those forces had been employed by any sovereign power. After the recognition of the new government by the United States, the courts of this country must accord to those who, throughout the progress of the civil war, acted as the agents of the people of Venezuela, the position of official representatives of the state. The act of recognition by our government neither added to nor detracted from the responsibility of the people of Venezuela for any prior injuries which citizens of the United States may have suffered on her soil from the hands of her de facto authorities; but these responsibilities, in our judgment, are to be adjudicated by the two governments by international action, according to the principles of international law applicable to such cases.

For these reasons, we conclude that the acts of the defendant were the acts of the government of Venezuela, and, as such, are not properly the subject of adjudication in the courts of another government.

The various requests made to the court on behalf of the plaintiff for instructions to the jury either involve propositions of law which, according to the views we have expressed, were properly refused, or propositions for the submission of questions of fact, as to which there was no conflict of evidence, and which, therefore, the trial judge was not required to submit to the jury. If the trial judge, in directing a verdict for the defendant, enunciated a rule which, to its full extent, may not obtain, because it implies that the defendant would not be civilly responsible, even in a court of Venezuela, for any act done by him as a military commander, his disposition of the case was proper, and the result is not affected by his expression of an erroneous opinion. The judgment is affirmed.