## BANCO DE ESPANA v. FEDERAL RESERVE BANK OF NEW YORK.

## SAME v. UNITED STATES LINES CO. et al.

## SAME v. SOLOMON.

District Court, S. D. New York.
July 14, 1939.

City (Sullivan & Cromwell, of New York City, of counsel), for plaintiff.

John T. Cahill, U. S. Atty., of New York City, for defendants Sigmund Solomon, etc., and United States Lines Co.

Winthrop, Stimson, Putnam & Roberts, of New York City (Henry L. Stimson, Paul Campbell, and William S. Ward, Sp. Assts. to Atty. Gen., and William L. Lynch, Asst. U. S. Atty., of New York City, of counsel), for defendant Federal Reserve Bank of New York.

LEIBELL, District Judge.

The Bank of Spain claims the title to and the right to possession of certain silver, in the form of Spanish coin, now in the United States Assay Office, New York City. To enforce its claims it instituted the above entitled actions in replevin.

Motions have been made on behalf of the respective defendant in each of these three actions, asking for the following relief: (1) For summary judgment for defendant on the ground that title to and right of possession of the silver is in the United States, having been purchased from the Government of Spain, and accordingly that plaintiff has no right to the possession thereof; or, in the alternative; (2) for a judgment dismissing the action for want of jurisdiction since the silver, the subject matter of the action, is the property of the United States; or (3) for a judgment dismissing the action on the ground that the suit is one in effect against the United States and the Court has no jurisdiction thereof. In the suits against the Federal Reserve Bank and the United States Lines Company respectively the defendant's motion for summary judgment is granted, and the alternative relief, for a dismissal of the action for want of jurisdiction, is denied. In the action against Sigmund Solomon, individually and as Superintendent of the United States Assay Office at New York, dismissal is sought by said defendant on the additional ground that the complaint fails to state a claim against him upon which relief can be granted. The action against him is dismissed for lack of jurisdiction, on the ground that the suit is one in effect against the United States, which has not consented to be sued. It is therefore unnecessary to consider the other grounds of his motion.

John Foster Dulles, Inzer B. Wyatt, and Richard G. Pettingill, all of New York

The Government of the United States has appeared specially in each action and

moved to dismiss the complaint principally on the following grounds: That the silver involved was purchased by the United States in the Spring and Summer of 1938 from the former Republican Government of Spain; that to the extent of 95% of the contract price payment was made to the then Spanish Ambassador; that the silver is owned by and is in the possession of the United States; that the suit is in effect a suit against the United States. This motion is granted in the suit against Sigmund Solomon, individually and as Superintendent of the United States Assay Office, New York, but the motion is denied in the suits against the Federal Reserve Bank and the United States Lines Company.

In each action the named defendant has also moved "to strike or dismiss the summons and complaint and all other papers served herein by Messrs. Sullivan & Cromwell, as attorneys for the alleged plaintiff, on the ground that the Bank of Spain has not authorized Messrs. Sullivan & Cromwell or any other person to commence or prosecute the above entitled action in its name or on its behalf". By stipulation, since filed herein, it has been requested that decision thereon be reserved until the trial. Those three motions are therefore not now decided.

I have made the above disposition of these various motions for reasons which will be hereinafter stated.

In the action against Sigmund Solomon, individually and as Superintendent of the Assay Office, New York, three shipments of silver, costing $6,450,000 are involved. The suits against the Federal Reserve Bank and the United States Lines Company, respectively, relate each to a separate lot of the three lots or shipments of silver which are the subject of the above-entitled Solomon action. Each of said three shipments comprised 2334 cases of Spanish silver coin and weighed approximately 5,000,000 troy ounces.

The suit against Sigmund Solomon, individually and as Superintendent of the United States Assay Office is in replevin, solely to recover possession of the three lots or shipments of Spanish silver coin, and seeks no money damages. The suit against the Federal Reserve Bank is also in replevin and relates to the shipment of 2334 cases of Spanish silver coin which arrived in the port of New York on the S. S. "Normandie" on May 30, 1938. In that action plaintiff seeks to recover as damages the value of the silver, $2,150,000, in the event that the defendant is unable to deliver the silver to plaintiff. The suit against the United States Lines Company is similar to that against the Federal Reserve Bank, and it involves another lot of silver in the same amount, which was shipped here on the S. S. "President Harding", arriving on July 2, 1938. It also seeks damages in the sum of $2,150,000, in the event that the defendant, United States Lines Company, is unable to deliver the silver to plaintiff.

The material facts, out of which this litigation developed, are as follows:

In January of 1938 His Excellency, Fernando de los Rios, at that time Ambassador Extraordinary and Plenipotentiary at Washington for the Government of Spain, asked the Hon. Henry Morgenthau, Jr., Secretary of the Treasury of the United States, if the United States would purchase silver from the Government of Spain. After consideration of the request, Secretary Morgenthau submitted to the Spanish Ambassador a memorandum of the procedure to be followed in the purchase of foreign silver by the United States.

On March 29, 1938, the Spanish Ambassador advised Secretary Morgenthau that his Government desired to sell approximately 5,000,000 troy ounces of its silver to the United States. Thereupon the Federal Reserve Bank of New York, as fiscal agent of the United States, at the direction of the Secretary of the Treasury, delivered through the Treasury Department to the Spanish Ambassador at Washington a cable addressed to the Bank of Spain at Barcelona, which under the arrangement between the two governments was to act as fiscal agent of the Spanish Government. The cable offered to purchase 5,000,000 ounces, .999 fine of silver at the rate of 43 cents United States currency per ounce, to be shipped to arrive on or before June 30, 1938, the offer to be accepted not later than April 2, 1938. The further particulars of this offer will be discussed later. On April 1, 1938, the Spanish Ambassador delivered to the Treasury Department a copy of a cable dated March 31, 1938, signed Negrin, Premier and Minister of Finance, requesting the Ambassador to inform the Federal

Reserve Bank of New York of the acceptance by the Bank of Spain of the silver purchase.

On May 27, 1938, the Spanish Ambassador delivered to the Treasury Department for transmission to the Federal Reserve Bank of New York a letter in which he set forth cabled instructions he had received from his Government and the Bank of Spain stating that, in accordance with the contract for the purchase of the silver arranged for in the cable of March 31, 1938, "by order and for account of the Treasury of the Spanish State", the silver had been shipped on the S. S. "Normandie" which sailed on May 26, 1938; that the Spanish Consul in New York would deliver to the Federal Reserve Bank the shipping documents and that the Federal Reserve Bank could make payment for the shipment "by check drawn to the order of the Spanish Ambassador in Washington". The silver, in the form of Spanish silver coin, arrived in New York on May 30, 1938. Following instructions of the Treasury Department, the Federal Reserve Bank of New York on May 31, 1938, received the bill of lading from the Spanish Consul in New York, endorsed it and on the same day assisted in the transportation of the silver to the United States Assay Office located at No. 32 Wall Street and No. 32 Old Slip, New York. The bill of lading named "Establissements Edouard Aget" as the shipper or consignor and provided that the silver was to be delivered to "Reserve Federal Bank New York or to its order (for the account of the Consul General of Spain, 515 Madison Avenue, New York)". The Establissements Edouard Aget was the agent of the Spanish Government formally designated as such to arrange this shipment. On June 2, 1938, payment for the silver to the extent of 95% was made to the Spanish Ambassador by check drawn to the order of "The Ambassador Extraordinary and Plenipotentiary of Spain to the United States" by the Federal Reserve Bank of New York as fiscal agent of the United States, on the Treasurer of the United States. The check was cashed for the Ambassador at the United States Treasury on June 3, 1938. The balance of 5% of the purchase price was, under the contract, to be withheld until the silver was assayed. This has not yet been done.

On June 3, 1938, an action in replevin to obtain possession of this silver, or in lieu thereof for damages, was commenced in the Supreme Court of the State of New York against the Federal Reserve Bank of New York by the Bank of Spain. The action was removed to this Court on July 8, 1938, where it is now pending as No. L 71/96.

On June 3, 1938, the Spanish Ambassador again advised Secretary Morgenthau that his Government was desirous of selling to the United States an additional 5,000,000 (second lot) .999 fine troy ounces of "its" silver. On the same date the Secretary of the Treasury delivered to the Spanish Ambassador pursuant to such request, an offer of the Government of the United States addressed to "The Government of Spain, Barcelona, Spain", to purchase on or before July 15, 1938, on the terms and conditions therein stated approximately 5,000,000 fine troy ounces of silver "owned" by the Government of Spain. On June 6, 1938, the Spanish Ambassador accepted on behalf of his Government the above mentioned offer of June 3, 1938, and agreed to sell the silver "owned by it", payment to be made by check drawn to the order of the Spanish Ambassador in Washington. On or about July 2, 1938, this second lot of silver arrived at New York on the S. S. "President Harding" of the United States Lines Company, the ship having sailed from Havre, France, on June 23, 1938. Under the express terms of the contract as set forth in paragraph (e) of the offer made by the Secretary of the Treasury on June 3, 1938, it was provided: "Title to the silver shall vest in the United States upon being delivered on board a steamship bound for New York City." The bill of lading, covering this shipment, named the Spanish Government as the consignor and the Superintendent of the United States Assay Office, Old Slip 32 New York, as the consignee. Shipping documents, under the terms of the contract, were to be forwarded directly to the designated consignee. The bill of lading covering the second shipment was delivered by mail to Superintendent of the United States Assay Office at New York pursuant to instructions of the Spanish Government. On arrival, the silver was received by representatives of the United States Assay Office and taken to the aforementioned United States Assay Office in New York. In accordance with the contract of purchase, payment to the extent of 95% was made by check drawn on the Treasurer

of the United States on July 14, 1938, to the order of the Spanish Ambassador at Washington, by the Superintendent of the Assay Office, New York, and the check was cashed for the Ambassador at the United States Treasury on July 15, 1938. The balance of 5% has not yet been paid because the silver has not been assayed.

On or about July 2, 1938, an action in replevin for this second lot of silver, or in lieu of delivery of the silver, for damages, was brought in the Supreme Court of the State of New York by the Bank of Spain against the United States Lines Company and against James E. Roberts, an employee of the company. The action was later discontinued as to Mr. Roberts. On September 6, 1938, the action was removed to this Court, where it is now pending as No. L 71/326.

On July 8, 1938, the Spanish Ambassador at Washington again advised the Secretary of the Treasury of the United States that the Spanish Government was desirous of selling a third lot of silver, also approximately 5,000,000 fine troy ounces, to the Government of the United States. On July 8, 1938, the Secretary of the Treasury delivered to the Spanish Ambassador, pursuant to such request, an offer of the United States addressed to The Government of Spain, Barcelona, Spain, to purchase approximately 5,000,000 fine troy ounces of silver "owned" by the Spanish Government on or before August 15, 1938, on terms and conditions which are similar to those relating to the above described second purchase, including the provision that title to the silver should vest in the United States of America on delivery of the silver on board a steamship bound for New York City. On July 10, 1938, the Spanish Ambassador advised the Secretary of the Treasury of the United States that the Government of Spain agreed to sell 5,000,000 fine troy ounces of silver "owned by it" on the terms of the offer of July 8, 1938. This third lot of silver arrived in New York on or about July 22, 1938, on the S. S. "Washington" of the United States Lines, which sailed from Havre on July 15, 1938. The bill of lading named the "Government of the Spanish Republic" as the consignor and the "Secretary of the Treasury of the United States; Washington, D. C. at New York", as the consignee. The bill of lading covering the third shipment was delivered to representatives of the Secretary of the Treasury by the Spanish Consul at New York. On its arrival the silver was received according to the terms of the purchase contract and was taken to the United States Assay Office at New York. On August 4, 1938, a payment of 95% for this third lot of silver was made by check drawn to the order of the Spanish Ambassador by the Superintendent of the Assay Office, New York, on the Treasurer of the United States. The check was cashed for the Ambassador at the United States Treasury on August 5, 1938. The balance of 5% of the purchase price remains unpaid because under the terms of the contract it is not due and payable until the silver is assayed. This has not been done.

On August 15, 1938, an action in replevin, not claiming damages, was commenced in this Court against Sigmund Solomon, individually and as Superintendent of the United States Assay Office at New York, for the above-described three lots of silver. That action is No. L 71/239 on the docket of this Court. No suit was brought against United States Lines Company in respect to this third shipment.

The suit against Sigmund Solomon, individually and as Superintendent of the United States Assay Office at New York, is, as stated above, an action solely in replevin, to recover possession of all three lots of silver, valued at $6,450,000. The complaint alleges that "at the time of the commencement of this action defendant, in violation of plaintiff's rights, wrongfully and without authority from the United States or otherwise held and now holds said chattels in his possession at the premises occupied by said Assay Office at 32 Wall Street and 32 Old Slip New York, N. Y., and wrongfully detained and now detains said chattels from plaintiff" after demand therefor. The judgment prayed for is that "defendant be adjudged and required to deliver to plaintiff" the three lots of silver described in the complaint. The defendant Solomon is not holding or possessing any part of the three lots of silver as an individual. If he were to attempt to comply with the demand as an individual, he would commit a criminal act. The silver was bought and paid for by the Government of the United States and is now part of its monetary stocks. It is in the possession of the Government of the United States and is physically

located at the United States Assay Office, New York. The Court cannot require Sigmund Solomon to perform any act as an individual in respect to this silver. In his official capacity, as Superintendent of the United States Assay Office at New York, he is only a mandatary, his possession being that of the Government of the United States. The assay office is a part of the Treasury Department. He is an employee of the Treasury Department and is subject to the laws of the United States and the rules, regulations and instructions of the Treasury Department. The affidavits in support of this motion show that he has received specific instructions from the Acting Secretary of the Treasury that the silver in question shall not be delivered to anyone other than a duly authorized officer of the United States. Naming Sigmund Solomon individually in the replevin action, as though he personally, and not officially, possessed the silver, does violence to the facts and is contradicted by other allegations in the complaint. He should not have been sued as an individual. The suit against him in his official capacity is in effect a suit against the United States. This Court may not assume jurisdiction or grant any relief therein, since the United States has not consented to be sued. Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.2d 677. If this Court had jurisdiction of the action, I would have granted defendant's motion for summary judgment on the ground that it is clearly established that title to and right to the possession of the silver are in the Government of the United States and not in the plaintiff, and there is no genuine issue as to any material fact.

■■ I am of the opinion that this Court has jurisdiction of the action against the Federal Reserve Bank and the action against the United States Lines Company. In each of these cases damages are sought, if the silver cannot be delivered by those defendants to the plaintiff. The fact that this silver is now owned and possessed by the Government of the United States does not deprive this Court of jurisdiction. The United States Lines was a common carrier for hire and cannot claim to be immune from suit, on the theory that the suit against the carrier is in effect a suit against the Government of the United States. Nor can the Federal Reserve Bank successfully advance that plea, although by

statute it is required to act as the fiscal agent of the Government of the United States, as·it did in respect to the first lot of silver which arrived on the S. S. "Normandie". The Federal Reserve Bank is much more than a corporate agency, created by Act of Congress, "for governmental ends". Even corporate governmental agencies, with only a few exceptions, have no legal immunity. See, Keifer & Keifer v. Reconstruction Finance Corp. et al., 305 U.S. 588, 59 S.Ct. 106, 83 L.Ed. ——, and cases cited therein.

■ In the suit against United States Lines Company in respect to the second lot of silver brought here on the S. S. "President Harding", the motion for summary judgment is granted. Title to the silver had passed to the Government of the United States when the silver was put on board the ship at Havre, under the express terms of the contract with the Government of Spain. The silver was bought directly by the Government of the United States from the Government of the Spanish Republic and it was shipped from Barcelona, Spain, by the Spanish Government through the firm of Aget, designated as the Government's agent in a Ministerial Order dated June 20, 1938, to the Superintendent of the United States Assay Office at New York, where it was claimed and received by him as such Superintendent. At the time the Ministerial Order was made on June 19, 1938, directing the Bank of Spain to make this lot of silver available to the Ministry of Finance and Economy in the form of a loan, pursuant to the decree of April 29, 1938, the silver was, as the Order states, "held in the custody of this Ministry of Finance and Economy". The Government of Spain acquired the Bank's title to the silver at Barcelona, Spain, on June 19, 1938. The Bank of Spain had no title to the silver or right to the possession thereof when it demanded the silver from this defendant, and it has no claim for damages for the failure of defendant, United States Lines Company, to comply with its demand for delivery of the silver.

■ As to the first lot of silver, plaintiff argues that the contract for its purchase was with the Bank of Spain, as principal, and that it provided for the purchase of silver, property of the bank, to be paid for by payment to the bank. The argument is based mainly on the fact that the Federal Reserve Bank in its cable to the Bank of

Spain stated: "We, as fiscal agent of the United States, will purchase from you up to approximately 5,000,000 ounces .999 fine of silver"; and "95% of cost of silver to be paid to you by us upon delivery of the silver." Plaintiff also relies on the letter of authorization to the Federal Reserve Bank from the Acting Secretary of the Treasury, dated March 29, 1938, confirming "specific authorization telephoned to you today, to agree to purchase, as fiscal agent of the United States, from the Bank of Spain, Barcelona" and stating further that "instructions regarding payment of the cost of the silver to be made by you, as fiscal agent of the United States, to the Bank of Spain, Barcelona, will be given to you by me on or before the date of delivery of the silver to you at a designated depositary pursuant to the terms of your cable."

At the beginning of the negotiations between the two governments the procedure outlined by the Secretary of the Treasury and communicated to the Spanish Ambassador at Washington on January 28, 1938, contained the two following paragraphs:

"3. The Federal Reserve Bank of New York, acting as fiscal agent of the United States, will cable the Bank of Spain, acting as fiscal agent of the Spanish Government, a message similar in form to the one enclosed, which is for your confidential information."

"5. The cable sent by the Federal Reserve Bank of New York, acting as fiscal agent of the United States, and cable acceptance of the Bank of Spain as fiscal agent of the Spanish Government received by the Federal Reserve Bank of New York will constitute a contract. No other papers relating to the contract are exchanged."

This clearly indicated that the contract was to be between the two Governments with the banks acting as their fiscal agents. In fact, the instructions of January 28, 1938, have an introductory clause: "The steps to be taken by your Government with respect to sale of silver to the Treasury Department of the United States would be as follows."

In paragraph "7" of the outlined procedure reference was made to a form of cable that the Federal Reserve Bank would send and to the method of payment. That form of cable was a general form, to be sent to a foreign bank whose name was left blank, and while it mentioned the fact that the offer was from the Federal Reserve Bank of New York "as fiscal agent of the United States" it did not name the foreign bank as a fiscal agent of the selling government. It appears to be a form of offer used on other occasions in the purchase of silver abroad.

On this point we should not overlook the provisions of Articles Two and Three (quoted in footnote [1]) of the Decree of the Spanish Government dated April 29, 1938, authorizing the Minister of Finance

---

[1] Articles two and three of the decree are as follows:

"Article Two: The Minister of Finance and Economy is authorized to take as a loan for the necessities of the war the necessary quantities of gold and silver coins, ingots or bars, property of the Bank of Spain; and the latter establishment is authorized to lend them to the Ministry of Finance and Economy. The said loans will be perfected by means of an Order, which the Minister of Finance and Economy will issue in accord with the President of the Council of Ministers, without prejudice to the establishment in due time of the requisite credits in conformity with the Budgets. Said order will oblige the Bank of Spain to deliver the specie and quantities referred, and for these, will constitute a certificate of credit in favor of the Bank, representing the obligation of reimbursement by the Spanish State. When the loaned specie are those in the custody of the Bank of Spain, the original Order will be delivered to it. When the loaned specie are those in the custody of the Minister of Finance and Economy, the latter will retain in his possession the Loan Order to discharge in due course the obligation of delivering to the Bank of Spain the quantities which are deposited with him according to the terms referred to in Article one of this Decree.

"Article Three: The Minister of Finance is authorized, in accord with the President of the Council of Ministers, freely to dispose of the gold and silver proceeding from the loans to which this decree refers. The Minister of Finance and Economy may determine, if circumstances warrant, that sales or hypothecations be carried out by the Bank of Spain as if they were operations by said establishment and without prejudice to the application to the operation in so far as the relations between the Bank of Spain and the State are concerned of the laws described in the preceding article."

and Economy "to take as a loan for the necessities of the war the necessary quantities of gold and silver coins, ingots, or bars, property of the Bank of Spain" and authorizing the Minister of Finance "in accord with the President of the Council of Ministers, freely to dispose of the gold and silver proceeding from the loans to which this decree refers". Article Three of the said decree then goes on to provide: "The Minister of Finance and Economy may determine, if circumstances warrant, that sales or hypothecations be carried out by the Bank of Spain as if they were operations by said establishment and without prejudice to the application to the operation in so far as the relations between the Bank of Spain and the State are concerned of the laws described in the preceding article." This decree of April 29, 1938, was made after the exchange of cables between the two banks on March 30th and April 1st, 1938, but before any of the first lot of silver was shipped on the Normandie on May 25, 1938. After the adoption of said decree on April 29, 1938, the Ministry of Finance and Economy of the Government of Spain promulgated two Ministerial Orders, dated May 17, 1938, and May 19, 1938, which are quoted in a footnote[2] and[3].

The silver shipped on the S. S. "Normandie" was that acquired in Barcelona, Spain, by the Government of Spain from the Bank of Spain under the Ministerial Order of May 17th, 1938. The instructions for shipment given to the Bank of Spain in the Ministerial Order of May 19th, 1938, directed the Bank to effect the transportation of the silver through the firm of Aget across French territory and its embarkation at the Port of Havre by order and for account of the Ministry of Finance and Economy. In my opinion these two Ministerial Orders, issued under said decree, show that the manner in which the transaction for the purchase and sale of this silver was concluded is the method originally outlined in the negotiations, namely as a transaction between the two governments, and that the extent of the part played by the Bank of Spain in the transaction was that of a fiscal agent of the Government of Spain. The record before me contains a copy of the letter from the Spanish Ambassador to the "Federal Reserve Bank of New York as Fiscal Agent of the United States", dated May 27, 1938, in which he states: "I am in receipt of the following cabled instructions from my Government and the Bank of Spain." The letter quotes the cable he received in which, among other things, he was instructed to advise the Federal Reserve Bank, "you can make payment for this shipment by check drawn to the order of the Spanish Ambassador in Washington."

Subsequently, and undoubtedly as a result of the demands and litigation made and instituted in the United States in respect to this first shipment of silver by persons assuming to act for the Bank of Spain, the two governments decided to

---

[2] Ministerial Order of May 17, 1938: "In conformity with the provisions of Article 2 of the Decree of the 29th of April, One thousand nine hundred and thirty-eight of this Ministry, with the approval of the President of the Council of Ministers, in the name of the Government of the Republic has decided as follows: That the Banco de Espana shall make available to the Ministry of Finance and Economy, in the form of a loan on the terms and conditions laid down in the Decree of April 29th, 1938, 175,000 kilograms of 5-Peseta silver coin representing a nominal value of 35,000,000 peseta."

[3] Ministerial Order of May 19, 1938: "This Ministry has decided to instruct the banking Institution, in connection with the silver which was the subject of a loan authorized by Ministerial Order of the 17th of the current month to effect, by order and for account of the Ministry of Finance and Economy, the operations necessary for the transportation in transit across French territory and the embarkation at the Fort of La Havre of the cases containing said metal for shipment and documentation in the name of the Federal Reserve Bank of New York, as fiscal agent of the Treasury of the United States of America. The transportation shall be entrusted to the representatives of the firm of AGET in accordance with instructions received at this Ministry from the Departments of the Under-Secretary General of Armaments, which firm will carry out, for transit purposes, all operations of transportation in France and of embarkation at the above mentioned Port, and shall deliver the documents relative to the embarkation to its Agency in Paris, which shall then carry out the necessary operations of verification and will forward the relative documents to the Consul General of Spain in New York for transmittal by him to the above mentioned banking Institution in that country."

deal directly with each other and eliminate the banks as fiscal agents in any future transactions for the purchase and sale of silver. This change is clearly established by the contracts for the second and third lots of silver and by the new form of ministerial orders issued in respect to the loan of said silver by the Bank of Spain to the Ministry of Finance and Economy, and its shipment. See footnotes [4] and [5].

Assuming, arguendo, that the contract for the first lot of silver was between the Federal Reserve Bank, acting as fiscal agent of the United States and the Bank of Spain, as a principal, I do not see that the plaintiff's position is improved. Plaintiff's suit against the Federal Reserve Bank is in replevin and is based on the claim that the title to and right to possession of the first lot of silver was in the plaintiff at all times, and that the Federal Reserve Bank "wrongfully received the chattels above described in violation of plaintiff's rights as owner thereof." Plaintiff's complaint in said action is inconsistent with its counsel's argument that the cables indicate that plaintiff entered into a contract as principal for the sale of the first lot of silver to the Federal Reserve Bank, as fiscal agent of the United States.

Although the Bank of Spain was privately owned by its stockholders, it performed certain governmental functions. It alone issued the paper currency used in Spain. It was created under a special statute and its rights, privileges and management were the subject of legislation. The management of the Bank was in charge of a Governor, two or three Sub-Governors and twenty-one Consejeros, who formed the Council of the Establishment; the Governor and Sub-Governors constituted the executive management of the Bank. Its Governor was appointed by the Spanish Government and so were the Sub-Governors. The Governor had the dual character of representative of the State and Chief Executive Officer of the Bank. He could delegate some of his powers under certain conditions to the Sub-Governors. He presided over the Council of the Bank.

Plaintiff argues that it was contrary to the Laws of Spain, as they existed in 1936 when the Franco revolt started, and contrary to the By-Laws (Statutes) of the Bank, to dispose of any monetary metal required as a reserve against the paper currency issued by the Bank and that therefore both the Spanish Government and the Bank were without power to do so.

To the affidavit of the former Spanish Ambassador, Fernando de los Rios, which he made October 17, 1938, while he was the duly recognized Ambassador of the Republic of Spain to the United States, there are annexed properly authenticated copies of the following:

1. Law of the Spanish Republic of October 14, 1937, authorizing legislation by decree under the circumstances and for the purposes therein specified, as published in the "Gaceta De La Republica", of October 15, 1937, the "Diario Oficial" of the Republic of Spain for the publication of laws and decree.

2. Decree of April 29, 1938, authorizing the Spanish Government to borrow silver from the Bank of Spain and directing the Bank of Spain to loan silver to the Spanish Government upon order of the Minister of Finance and Economy, with the approval of the President of the Council of Ministers, providing for the terms and method of payment for such loans of silver; and authorizing the Minister of Finance and Economy to dispose of the silver for the Government.

3. Certificate of 'the Secretary General

---

[4] Ministerial Order of June 19, 1938: "In conformity with the provisions of Article 2 of the Decree of the 29th of April, One thousand nine hundred and thirty-eight this Ministry, with the approval of the President of the Council of Ministers, in the name of the Government of the Republic has decided as follows: That the Banco de Espana shall make available to the Ministry of Finance and Economy, in the form of a loan on the terms and conditions laid down in the Decree of April 29th, 1938, 175,000 kilograms in 5-Peseta silver coin representing a nominal value of 35,000,000 pesetas, held in the custody of this Ministry of Finance and Economy."

[5] Ministerial Order of June 20, 1938: "Please give instructions to effect the operations relative to the embarkation and transportation of the 175,000 kilograms of 5-Peseta silver coin which are the subject of the Order of this Ministry, dated today, and which the firm of AGET is shipping to the Federal Reserve Bank of New York as fiscal agent of the Treasury of the United States of North America."

of the Bank of Spain, upon the order and approval of the Governor of said Bank, that a copy of the foregoing decree of April 29, 1938, was transmitted to the Governor of said Bank on April 30, 1938.

4. Six Ministerial Orders, relating to these three lots of silver, dated May 17th, May 19th, June 19th, June 20th, and July 8th, 1938 (2).

Under the above statute and decree defendants contend that any former requirements as to a monetary metal reserve were legally changed and the Bank of Spain was obliged to loan to the Spanish Government the silver later sold by that Government to the Government of the United States.

The law of the Spanish Cortes, dated October 14, 1937, was published in the Official Gazette of the Spanish Republican Government. The existence of that law is not challenged by plaintiff. It authorized government by decree for certain purposes, although plaintiff contends it did not authorize government by decree in respect to the metal resources of the Bank of Spain, or government by secret decree. The decree of April 29, 1938, states that it is issued pursuant to that law. In fact the decree quotes as authority for its issuance part of the law of October 14, 1937. See footnote [6]. It further appears on the face of the decree of April 29, 1938, that the loan of the gold and silver, which the Bank of Spain was directed to make to the Ministry of Finance, was "for the necessities of the War". The opening paragraph so states and gives the reasons therefor. See footnote [7].

The decree of April 29, 1938, provided that on the compliance by the Bank with the terms of an Order of the Ministry of Finance made pursuant to the decree, the Order itself would constitute a "certificate of credit in favor of the Bank, representing the obligation of reimbursement by the Spanish State". There is nothing extraordinary about this arrangement, when we consider the course followed by other foreign countries in debasing their currencies.

■ Plaintiff argues at length that the loan of the silver by the Bank to the Minister of Finance did not pass title to the silver and therefore that the Spanish Government could not in turn give good title to others. Further, that any expropriation of the silver by the Government of Spain took place outside the territory of Spain either in France, on the last two shipments, or in the United States, on the first shipment. A consideration of the provisions of the decree and the Ministerial Orders issued thereunder leads to the conclusion that plaintiff's contention is unsound and incompatible with the facts.

What was loaned by the Bank of Spain to the Spanish Government was Spanish coin. This was not like the loan of a specified chattel, to be returned by the borrower. Considering only that part of the decree (Article Two) it must be evident that the Government was not required to pay back the identical coin it borrowed. The same would be true if the loan were gold or silver bullion. The loan passed title to the silver, from the Bank of Spain to the Spanish Republican Government, at Barcelona, Spain. The decree went beyond a bare provision for the loan. It specifically gave to the Minister of Finance and the President of the Council of Ministers the right "freely to dispose of the gold and silver proceeding from the loans to which the decree refers". From the decree and the Ministerial Orders issued in respect to the last two lots of silver, it readily appears that title to that silver and possession thereof were acquired by the Spanish Government in Barcelona. The Bank of Spain was not even

[6] Part of law of October 14, 1937, quoted in decree of April 29, 1938: "Determination of the maximum limit of circulation, establishing a coverage, in metals, securities, effects, or credits to guarantee all kinds of notes or paper money; fixing of the limits and conditions of credits which may be opened with the State by public credit entities; and liquidation of juridical question and accounts created by the needs of the Minister of Finance and Economy."

[7] Part of opening paragraph of decree of April 29, 1938: "The circumstances of the war which the legitimate Government of the Republic maintains in defense of the independence of Spain demand that the economic resources of the country contribute to the military effort of the Spaniards. It is not to be doubted that among these resources, and as National Treasure, are the gold and silver reserves accumulated by the Bank of Spain by virtue of its privilege of issuing notes, and, therefore, it is necessary to authorize the disposal of said reserves without prejudice to the obligation of reimbursement, in the same proportion as they may be used, which the State assumes with that establishment."

970

a fiscal agent in respect to the said last two silver transactions. As to the first lot of silver, the same conclusion is no less clear when the two Ministerial Orders of May 17th and May 19th are read in connection with the decree. The Bank of Spain by the Ministerial Order of May 17, 1938, is directed to "make available to the Ministry of Finance and Economy", in the form of loans" on the terms and conditions laid down in the Decree "the designated quantities of 5-Peseta silver coin". Under the Ministerial Order of May 19, 1938, the Bank was instructed to effect the transportation of the silver through the firm of Aget, the Government's agent, "by order and for account of the Ministry of Finance and Economy".

To all three transactions the provisions of Article Two of the decree applied, that the Ministerial Order "will oblige the Bank of Spain to deliver the specie and quantities referred, and for these will constitute a certificate of credit in favor of the Bank, representing the obligation of reimbursement by the Spanish State".

In my opinion the documentary record shows that there is no genuine issue as to when or where the Government of Spain acquired title to the silver. It was in Barcelona, Spain, before the silver was shipped out of Spain.

Plaintiff has attempted to raise an issue as to the genuineness of the aforementioned Decree of April 29, 1938, and the six Ministerial Orders dated May 17, May 18, June 19, June 20 and July 8, 1938, issued pursuant to the decree. Plaintiff has obtained a certificate (dated May 22, 1939) from Asdrubal Ferreiro Cid, Chief of Administration of the Third Class of the Expert Accounting Division of the State, Senior Official of the Ministry of Finance, the present official charged with the custody of the Archives of the Ministry of Finance. This certificate is necessarily limited. He states: "I have under my custody the official archives of this Ministry, in which, after minute investigations made in all the offices where the services of Finance and Economy of the Republican Government were successively installed, there has not been found any original document, entry or record of the purported measures of said Ministry which are detailed as follows." Then follows a list of the decree of April 29, 1938, and the six ministerial orders, of which duly authenticated copies have been submitted by defendants, annexed to the affidavit of Don Fernando de los Rios, sworn to October 17, 1938. The May 22, 1939, certificate is of course by an official of the present Government of Spain, the successful Franco forces of the late civil war in Spain. The certificate does not state, and of course could not state, that this official has in his custody all the official archives of the Ministry of Finance and Economy of the former Republican Government. Nor does the certificate state whether or not any copies of the documents were found—it is limited to original documents, entries or records. If the certificate related to documents, entries or records of the Franco Government it would have some probative value, but it purports to relate to archives of the former Republican Government of Spain. It is not the certificate of an official who succeeded to the office of custodian of records without any interruption and in the usual orderly way in which one official follows another in that capacity in an established government. Whatever records of the former Spanish Republican Government came into this custodian's possession did so as the result of the conquest by the Franco forces of the territory formerly occupied by the Spanish Republican Government. When we consider that the former Government of Spain (the Loyalist) was defeated, that it abandoned Barcelona and other places to which it successively retreated, until its officials and a large part of its army crossed into France, and that the former Spanish Government soon thereafter ceased to exist, of which we can take judicial notice, it may very well be that when the new Government of Spain took possession of Barcelona and other territory formerly held by the Loyalist forces, it did not find these documents "after minute investigations made in all the offices where the services of Finance and Economy of the Republican Government were successively installed."

Even the limited probative value of the certificate of the present custodian of the archives of the Ministry of Finance, made May 22, 1939, is further weakened, if not completely destroyed, by the duly authenticated copies of these same documents, all certified to in August 1938 and annexed to the affidavit of the Spanish Ambassador, sworn to on October 17, 1938. Further, defendants have submitted the certificate of S. Regueria, Secretary

General of the Bank of Spain, made in August 1938, countersigned by Luis Nicolau D'Olwer, the Governor of the Bank, sealed with the seals of the Bank and the Minister of State. It reads: "Certifies: That in the confidential archives of this Banco de Espana there is retained a confidential certification forwarded by The Honorable the Under-Secretary of the Treasury in Barcelona on the 30th of April, 1938 covering transmittal to the Governor of the Banco de Espana of the text of a decree of the Minister of Finance, also confidential, promulgated on the 29th of the above mentioned month and year."

That certificate is duly authenticated by Don Adolfo Sisto Hontan, Under-Secretary of the Ministry of Finance.

Plaintiff's counsel intimates that the decree of April 29, 1938, and the ministerial orders issued thereunder may have been an afterthought, that they were not made on the dates they bear but were manufactured after this litigation was instituted for the purpose of satisfying the Government of the United States that the acts of the Spanish Republican Government with respect to the sale of the silver were taken pursuant to said Decree and Ministerial Orders. That argument is based on suspicion only. It is obviously weak because the Law of the Cortes of October 14, 1937, published in the Official Gazette on October 15, 1937, gave the officials of the Government of Spain the right to govern by decree in relation to many matters, including its currency and credits, the subject matter of the decree of April 29, 1938. If the power to make the decree existed, what would be the necessity for not exercising that power, especially by a secret decree. The decree itself provided that it was to be secret, "its publication in the Gaceta de la Republica being withheld until the Government considers it opportune". Secrecy was neither unreasonable or suspicious under the circumstances then existing. Government by decree, secret decrees, was not limited to Spain, either then or now.

An examination of the decree of April 29, 1938, discloses many provisions which would not have been necessary, if its only purpose was to meet the issue of title to the silver raised by plaintiff's suits. Articles Two and Three of the decree, hereinbefore quoted in a footnote, would have sufficed for that purpose. The whole decree, by its references to other statutes and decrees and by its numerous other provisions, appears to be a carefully drawn document, intended to meet all the conditions arising from the loan of gold and silver by the Bank of Spain to the Government of Spain. If this decree were a document manufactured for the purposes of these suits, which relate solely to silver, how is it that the decree provides for borrowings of gold as well as silver, from the Bank of Spain by the Republican Government of Spain?

It cannot reasonably be argued that these documents, the decree and the Ministerial Orders, did not physically exist in August 1938, because certified copies were prepared at that time and part of their authentication passed through the hands of the diplomatic representative of the United States at Barcelona, Spain. And if they did so exist in August 1938, of what probative value is the certificate of the present custodian of the records of the Ministry of Finance under the present Government of Spain, that he could not find the originals in May 1939? It is not sufficient to raise any genuine issue of fact.

The motions of the respective defendants are supported by the affidavit of Henry Morgenthau, Jr., the United States Secretary of the Treasury, and the affidavit of Don Fernando de los Rios, sworn to October 17, 1938, while he was the Spanish Ambassador to the United States. It was he who in the Spring and Summer of that year conducted the above described negotiations with the Secretary of the Treasury for the sale of the silver by his Government to the Government of the United States. Their affidavits are specific and direct. They recite the details of these transactions and annex documents to support their averments. The facts set forth in the affidavit of Mr. Morgenthau are not put in issue by any opposing affidavits. As to the affidavit of the Spanish Ambassador plaintiff suggests that perhaps he was not properly informed of what was really happening at Barcelona, Spain; in other words, that his Government was deceiving him as to the true facts.

Formal objection is made by plaintiff to the receipt and consideration by this Court of the aforementioned affidavit of the Spanish Ambassador on two grounds, (1) that it does not appear that his government authorized him to make

972

the affidavit and waive his immunity in respect to testifying, and (2) that the documents annexed to the Ambassador's affidavit are not properly authenticated. Taking up the last point first: All of these documents were certified early in August 1938 by Don Adolfo Sisto Hontan, the Under-Secretary of the Ministry of Finance. Don Hontan's signature as the Under-Secretary of the Ministry of Finance is certified to by Emilio Pavon, the Chief of Legalizations of the Ministry of State of the Spanish Republic. Mr. Pavon's signature and office were in turn certified to in August 1938 by Mr. Lee Worley, the Vice-Consul of the United States of America at Barcelona, Spain. On the argument of these motions there was filed with the Court a further certificate by Mr. Worley as said Vice-Consul, dated October 21, 1938, in which he states that these documents were duly certified to by Don Hontan "who on the respective dates on which said certificates were executed by him, was the Under-Secretary of the Ministry of Finance and was, as such, authorized by the Minister of Finance to sign each of the documents certified to by him; such Ministry of Finance being the lawful custodian of the original of each document". If there were any technical defect in the prior certification by the Vice-Consul in respect to custody of the documents, it was cured by this later certificate (Title 28 U.S.C.A. § 695e; Rule 44 (c) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c), although even this certificate fails to satisfy plaintiff because the "Ministry" instead of the "Minister" is certified as the custodian. That is not important. New Mexico v. Texas, 275 U.S. 279, 48 S.Ct. 126, 72 L.Ed. 280.

■ As to the other point, that it does not appear that his government authorized the Spanish Ambassador to waive his immunity and make the affidavit, I think that all of the surrounding circumstances indicate that he made the affidavit with the full knowledge and approval of his government. He annexes to it duly certified copies of documents from the files of the Spanish Ministry of Finance, which were sent to him by his Government. Why should these documents be so carefully certified if they were not to be used in a legal proceeding? He was not compelled to make the affidavit. He had conducted the negotiations for the sale of the silver by his own government to the Government of the United States. He was the logical man to make the affidavit stating what his Government did, just as Mr. Morgenthau, Secretary of the Treasury, made an affidavit of what the Government of the United States did in these matters. The immunity from testifying is something to be claimed by an Ambassador. If he testifies voluntarily, without the authorization of his Government, that is a matter between him and his Government. "It deprives him neither of his competency, nor of his credibility". United States v. Ortega, 4 Wash. C.C. 531, 27 Fed.Cas. 359, 361, No. 15,971. A third party has no right to assert it for his own benefit.

■ Affidavits of certain experts on Spanish law have been submitted by plaintiff in an endeavor to show that it was not within the power of the Spanish Government to make the decree of April 29, 1938, or to sell the silver it acquired from the Bank of Spain, because of provisions of the Spanish Constitution and certain statutes of the Spanish Cortes. Likewise, plaintiff attacks as unconstitutional the decrees of the Spanish Government, reconstituting the membership of the Board of Directors of the Bank of Spain by removing or declaring ineligible certain members of the Board and naming others in their place. Because what the law of Spain is or was presents a question of fact, plaintiff contends that a material issue of fact is created by the opinions of these experts on Spanish Law, which prevents a determination of this litigation on a motion for summary judgment. The depositions of these experts would be considered if the acts challenged as illegal were not the acts of a foreign sovereign, in respect to property within its territorial borders, acting under some colorable legal sanction. But from all the documentary records in this case it was the sovereign Government of Spain that by its acts was dealing with silver located in Barcelona, Spain, assuming to act under a governmental decree which states that it was issued pursuant to a specified existing statute. This Court cannot go in back of the decree, valid on its face, or the ministerial orders giving effect to the decree, to consider whether or not they were constitutional in Spain, or consistent with the provisions of any statute of the Spanish Cortes.

"The courts of one independent government will not sit in judgment on the validity

of the acts of another done within its own territory. * * * When it is made to appear that the foreign government acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision." Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 314, 62 L.Ed. 733, citing cases.

■ Here the plaintiff was a corporate national of the Spanish Government at the time of the alleged expropriation of the silver located in Barcelona, Spain. Plaintiff should seek relief in the courts of its own country against those who are alleged to have illegally taken the silver. United States v. Belmont, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134.

■ Plaintiff's counsel further argues that there is an issue of fact as to whether the officials who acted for the Government of Spain in these transactions were acting for their government or for themselves individually or for some labor organizations. Plaintiff suspects that by these silver transactions the Spanish officials looted the Bank of Spain for themselves or for certain non-governmental organizations. However, we can take judicial notice of the fact that Negrin, who gave the instructions to the Spanish Ambassador, was the Premier and Minister of Finance of the Republic of Spain. The record shows that the negotiations for the purchase and sale of the silver were carried on with the Secretary of the Treasury of the United States by the duly accredited Spanish Ambassador at Washington. The suspicion of private looting, advanced by plaintiff's counsel, is based on (1) certain initials of Spanish labor organizations appearing on the boxes in which the silver was shipped, and (2) on the fact that the Spanish Ambassador cashed at the Treasury Department the checks given in payment for the silver. Plaintiff's counsel does not directly question the good faith or honesty of the Secretary of the Treasury and his assistants, and so states. The initials on the boxes of silver could properly be accounted for without suspecting that they indicate that the silver was stolen from the Bank of Spain and turned over to those organizations. Likewise the fact that the Spanish Ambassador had the checks cashed at the Treasury Department does not justify the suspicion that he was taking the money for the personal purposes of officials of the Spanish Government or of certain Spanish organizations, or warrant the inference that the Secretary of the Treasury and his assistants connived at it. Indeed the notices and demands and litigation in this country, emanating from certain persons who claimed to be acting for the Bank of Spain, would be a good reason for not depositing the checks in any account which would expose the fund to further litigation.

■ But why all these suspicions as to the personal motives and purposes of the officials of the Spanish Republican Government? Suspicions are not sufficient to raise a genuine issue of fact. Suspicions might be directed to the other side of this litigation also, as to the real source of the notices, demands and litigations herein, while a civil war was being fought in Spain. The neutralization of these funds through litigation had certain military advantages. This Court will not base its decision of these motions on suspicions, but on facts. Rule 56 (c) of the Federal Rules of Civil Procedure requires the existence of a genuine issue as to a material fact, on which to base a denial of a defendant's motion for summary judgment. The same is true under Rule 113 of the New York Rules of Civil Practice. Curry v. MacKenzie, 239 N.Y. 267, 146 N.E. 375. In my opinion the suspicions advanced by plaintiff's counsel serve to create only a feigned issue.

■ It is claimed that another issue of fact is presented, by affidavits submitted on behalf of plaintiff, as to the consent of the Bank of Spain to the silver transaction with the Spanish Government, whether the consent was given by duly constituted officers and directors and whether it was voluntary. The decree and the ministerial orders were mandatory. The Bank apparently complied. Whether it did so voluntarily or under legal compulsion is not material to the determination of these motions. In this connection the affidavit of Aurelio Valls, sworn to March 24, 1939, asserts that the "head office of the Bank of Spain is now and has been for some time located at Burgos, Spain". He also states that "the moving papers (defendant's) indicate that the silver was shipped to the United States from the Branch of the Bank of Spain at Barcelona". But his affidavit states in another paragraph that "the Bank of Spain has its head office under normal conditions at

Madrid". The records would indicate that the head office of the bank followed the Spanish Loyalist Government when it moved from Madrid to Barcelona. But all of that is beside the point. Those who were in charge of the Bank of Spain at Barcelona, whether elected by the stockholders or appointed by the Government, whether the head office was in Barcelona or elsewhere, complied with the decree of the Spanish Republican Government and with the Ministerial Orders issued thereunder in respect to this silver located in Barcelona. It may be that government by decree does not leave much choice to those affected by the decrees. But it has become quite common in some foreign countries.

In the three cases now before the Court, the present Chargé d'Affairs of Spain in the United States has filed a "suggestion" dated May 25, 1939, in which he states that it is the desire of the present government of Spain "in so far as it is concerned and in so far as relate to the issues in the above-entitled cause, that this important matter should be determined after trial on the merits", at which the full facts will be before the court. In the formal suggestion thus filed reference is made to the aforementioned affidavit of Fernando de los Rios, sworn to October 17, 1938, and the statement is made that the Chargé is informed that this Court "as an act of international comity toward my government may feel that it should not inquire into the facts and law, but should give conclusive effect in the above entitled cases to the statement of Mr. de los Rios". The "suggestion" then raises a question as to the reliability of the sources of information available to the former Spanish Ambassador, Mr. de los Rios, and states: "My government does not know whether the paper record, as presented by Mr. de los Rios is complete or authentic, or whether the facts with reference to the taking of the silver conform to this paper record."

It was stated in Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 311, 62 L.Ed. 726: "The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.' "

I am of the opinion that this principle applies in this case even though the successor government of that foreign country has filed with this Court a suggestion that it has no objection to the trial here of issues involving the acts of the government it succeeded. The transactions were between two sovereign governments, one of which bought from the other great quantities of silver, and paid 95% of the purchase price and the title of the purchaser is now attacked in this litigation. International comity and expediency are not unilateral.

The Secretary of the Treasury was authorized by Act of Congress, the Silver Purchase Act of 1934 (48 Stat. 1178, c. 674, 31 U.S.C.A. § 448 et seq.) to purchase silver here or abroad (31 U.S.C.A. § 734a) for the purpose of maintaining a ratio of 3 to 1 in the monetary stocks of gold and silver held by the United States (31 U.S.C.A. § 311a). He paid for the silver with funds made available for that purpose by Congress. The silver thus purchased became part of the reserve against which silver certificates are issued by the United States Treasury (31 U.S.C.A. § 405a).

In Underhill v. Hernandez, 2 Cir., 65 F. 577, 579, 38 L.R.A. 405, the Circuit Court of Appeals of this Circuit, in an opinion written by Judge Wallace, stated: "Considerations of comity, and of the highest expediency, require that the conduct of states, whether in transactions with other states or with individuals, their own citizens or foreign citizens, should not be called in question by the legal tribunals of another jurisdiction. The citizens of a state have an adequate redress for any grievances at its hands by an appeal to the courts or the other departments of their own government."

This case was later affirmed by the United States Supreme Court, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456.

In American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 513, 53 L.Ed. 826, 16 Ann.Cas. 1047, Mr. Jus-

tice Holmes based the principle on something more than considerations of comity or of the highest expediency. He wrote: "The fundamental reason is that it is a contradiction in terms to say that, within its jurisdiction, it is unlawful to persuade a sovereign power to bring about a result that it declares by its conduct to be desirable and proper. It does not, and foreign courts cannot, admit that the influences were improper or the results bad. It makes the persuasion lawful by its own act. The very meaning of sovereignty is that the decree of the sovereign makes law."

There is another principle involved which also makes it impossible to consider favorably the "suggestion" filed herein by the Chargé d'Affairs at Washington of the present Spanish Government. That principle was recently stated by Mr. Justice Stone in Guaranty Trust Co. v. United States, 304 U.S. 126, at page 140, 58 S.Ct. 785, 792, 82 L.Ed. 1224, as follows: "The very purpose of the recognition by our government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are. If those transactions, valid when entered into, were to be disregarded after the later recognition of a successor government, recognition would be but an idle ceremony, yielding none of the advantages of established diplomatic relations in enabling business transactions to proceed, and affording no protection to our own nationals in carrying them on."

The principle applies a fortiori to transactions between two governments, one of which is later overthrown and a successor government recognized.

It appears to me that these cases should be disposed of on these motions and not at a trial. No genuine issues of any material facts are presented. The entire transaction is before the Court, evidenced mainly by duly authenticated or undisputed documents. The Rule for summary judgment was intended for just such a situation. Defendants' motions for summary judgment are accordingly granted in the suits against the Federal Reserve Bank and the United States Lines Company. Summary judgment would also have been granted, if I were of the opinion that the Court had jurisdiction, in the suit against Sigmund Solomon, individually and as Superintendent of the United States Assay Office at New York. As to the Solomon suit I hold that this Court has not jurisdiction, because it is in effect a suit against the United States which has not consented to be sued. The various motions of the defendants and of the United States are disposed of as indicated in the opening paragraphs of this opinion. Submit orders on two days' notice.